okay all right so good morning each side in this matter we are now going to do the Poe v. Labrador each side will have 20 minutes if appellants would like to reserve time for rebuttal please be aware that you are responsible for keeping track of your own time it's also my understanding that the United States has filed an amicus brief and that the appellees will share six minutes of their argument time with counsel for the US Department of Justice so mr. Bursch Bursch okay mr. Bursch thank you so much you may begin when you are ready thank you good morning your honors John Bursch on behalf of Attorney General Labrador I hope to reserve five minutes for rebuttal may it please the court Idaho and the rest of the country are facing an epidemic of teenage depression everyone is looking for solutions some have turned to treatments that physically altered children's bodies to match their perception of their sex but these treatments are experimental and they carry heavy risks as evidenced by the UK's Cass review and many other studies but for two reasons this panel need not resolve the science because rational basis review applies here first the VCPA does not regulate based on who seeks treatment but based on the benefits and risks of the treatment requested when a doctor removes a young woman's breasts it matters whether the reason is breast cancer or for the purpose of making her look like a boy and a vaginoplasty has very different risks when performed on a boy than on a girl second there is no substantive due process right to any specific medical treatment and so there is no parental right I'd like to ask you some questions okay so the statute specifically defines treating gender dysphoria as and I quote never necessary to a minor's health are there any other laws in Idaho that you are aware of that specifically define the purpose of a treatment as never medically necessary I have not squared the books but I'm not aware of that okay and is it Idaho's position that gender dysphoria is not a legitimate medical diagnosis absolutely not jet de Alba it's it's in the DSM 5 it's a recognized medical diagnosis but there is a substantial disagreement among medical professionals about what the appropriate treatment for gender dysphoria is and there are great risks of the medical interventions that plaintiffs are advocating for in this case let's go back to when your earlier statements that this only has to do with diagnosis doesn't have anything to do with sex but this statute unlike some others actually uses the words that it's pegged to the child's biological sex yes how can you say that this is not related to sex for the same reason that the Supreme Court said it in Dobbs Judge McEwen there too Mississippi had a 15 week law that used sex to define who and could not have abortions it was limited to women it was a 100% disparate impact and yet the US Supreme Court in Dobbs applied only rational basis and held that the regulation of a procedure that only one sex can undergo does not result in heightened scrutiny unless it was mere pretext and that makes sense because if Idaho were to regulate medicines so that a different dosage went to men and women no one would say that sex discrimination otherwise this quite a bit different than Dobbs and the could be male or female yes and Dobbs a very different thing I don't know of any men getting abortions so it seems to me that this is targeted at gender and sex in a very different way than was talked about in Dobbs or the earlier Supreme Court case on pregnancy Judge McEwen the fact that this can affect men and women makes it an easier case for us to prove there's no sex discrimination than there was in Dobbs. In Dobbs 100% of the people who were affected were women and yet the court said rational basis applies in that context the fact that medical treatments here apply to men and to women makes this case an easier equal protection analysis not a harder one. In that regard that's an argument that's often made well applies to both sexes so it can't be sex discrimination but I thought we overcame that in Loving and also in Bostock really aimed at this that it actually doubles the problem it doesn't resolve the problem. I'm glad that you raised Bostock's I wanted to address that specifically Judge McEwen men and women in the employment context simply are not comparable to medical treatment for boys and girls in the former the Supreme Court held that biological difference is irrelevant in the latter it means everything again breast removal for a girl who has cancer versus one who wants to appear to look like a boy very different reasons for that medical treatment and that's why unlike hiring and firing in the Bostock context the government can regulate procedures based on only one sex so for example the state could regulate prostate cancer treatments it could regulate cervical cancer treatments and none of those would be subjected to heightened scrutiny even though they only apply to one sex to the exclusion of the other sex. What's more Bostock says that discrimination based on transgender status in hiring and firing equals discrimination based on sex but that's not the question here when we're talking about matters of biology the question is whether differentiation based on the benefits and risk of specific medical procedures is transgender discrimination and it's clearly not. I appreciate your distinguishing of Bostock and it's one that's often done in these cases as you know but in this regard we have at least as I understand the landscape that non-transgender minors can get for example testosterone. Yes. And they can get a mastectomy for example. Yes. A male a cisgender individual could get a appearance of breasts or tissue you know top tissue so it seems to me that in permitting the treatment there that you are creating a classification that distinguishes between cisgender and transgender. Why not? Judge McEwen it's because those are not the same treatments even though the same procedure is being done so think about the risks if a boy has unusually large breasts and has a breast reduction he does not lose the opportunity to breast feed his future children but if a girl gets a mastectomy she does she loses that forever and there's all kinds of other consequences that she would experience as well. In the first instance the procedure is done to try to help the boy have a healthy body. In the second instance it's to change the person's appearance and the risk-benefit analysis is different. Let me let me plug on that then if if you're saying in the first instance is to you know help the the child with the excessively large the young man with the excessively large breasts and that helps them in the second the argument would be well then it helps individuals with gender dysphoria feel more comfortable they won't have as many mental health issues so there is a benefit to it it's not a hundred percent all the negativities let's look at the bone density issues let's look at impacts to fertility there's positives there too I mean there was evidence presented that you know a lot of these children who are having these issues suffer from depression and all of these other things and that such surgeries actually help them. Judge DiAlbo the state does not deny that it's possible that there could be help but undeniably there is also harm and the risk-benefit analysis is different in the two different situations that's why the treatments aren't the same again consider a vaginoplasty if you do it on a girl who had some kind of sexual mutilation because of a horrible attack that the benefits and risks to repairing her body are very different than a vaginoplasty for a boy who wants to identify as a girl you can't remotely say that those two things are comparable. But I think that misses the point I mean I think there is evidence that shows that gender dysphoria is a big complicated issue for the people who suffer from it. Absolutely but what that's not taking into account and what Idaho's law does is that a great number of kids who experience gender dysphoria will eventually align their mind with their body and not experience it anymore if there is no intervention. Some scientists say 85% that's the endocrinology folks that the plaintiffs cite for their their experts and so for those kids. I credit your argument that there is there is some disagreement in this area. Yes. Absolutely we look at the record we look at your brief we look at the other brief we look at all the Mika's briefs but here we're here on an injunction and in that injunction we had the district court looking at all of this and crediting what you saying crediting what the plaintiffs were saying and then coming out basically saying that in his view that the experts with respect to the gender dysphoria referred to by Judge D'Alba actually those should be accorded more weight at this stage. We would have to completely tip those findings on a clear error review wouldn't we in order to reverse the injunction. Well two responses to that Judge McEwen first it's not a clear error review as the US Supreme Court made clear in Gonzales when you're talking about matters of science the courts are supposed to defer to the legislature not second-guess them and you'll recall that Gonzales was an abortion case and heightened scrutiny applied and yet still the court deferred to the legislative findings of the legislature in that case. The other thing that the district court judge did here which was wrong as a matter of procedure he painted with a broad brush and he said I think that the benefits outweigh the risks for all these procedures and so I'm going to enjoin everything. Well now we have the benefit of the US Supreme Court's order in this case which limits this to a very small matter which is natal males who want estrogen and on that particular issue which the trial court judge did not analyze in any detail the evidence is legion. This is on page 692 of the appendix all with citations to medical evidence. Natal males treated with estrogen have a 36-fold higher risk of stroke. Males treated with estrogen have a 22-fold increase in the rate of breast cancer, may have an increased rate of prostate cancer, may increase the risk of other cancers, may alter their immune systems and increase the risk of autoimmune disorders. And this is the big thing the endocrine society again endocrine and WPATH are their two big organizations. One member of the endocrine society guidelines authoring committee admitted they had no data, no data to justify the guidelines allowing doctors to prescribe cross-sex hormones to youth under age 16. That's at page 27 note 52 of the Alabama amicus brief. So if we're going to analyze the scientific evidence we need to do what the district court did not do which is analyze it for the one plaintiff who's left in the case here. And if you properly defer to the legislative findings which you must do that's what Gonzalez says and that's what other Supreme Court cases suggest. I point you to that menorah decision from the Seventh Circuit that Judge Posner wrote. It's page 17 of our reply brief. He talks at length about federal rule 201 and its explanatory comments about the difference between legislative facts and adjudicative facts. That applies with full force here just like it did in Gonzalez. So when you look at that you know at a minimum there's at least a tie although I think that the scientific evidence is drastically greater in our favor when it comes to risks. But even in a tie that tie has to go to the legislature when you're talking about legislative facts in this context. Let me ask you, do you think we should hold this case for the Supreme Court's review of I was expecting you might say that. I'm sure you might have an answer. If this was just an ordinary case involving monetary damages or something like that you know I would say by all means we should wait but we're talking about the health of kids that's at risk here. And with that injunction in place in the trial court any other male who comes in and wants estrogen treatments is going to be able to get an injunction from this the same judge. And so I don't think waiting is an option. I think you need to look at the fact that this is a statute that differentiates based on medical treatments and the specific risks and benefits and apply rational basis. If you slow down a little bit it would help. Of course Judge McEwen. There's a lot of information here and I'm trying to get everything you're saying. Yes we have such a short time together. We have a short time and I know that our presiding judge will be a little lenient given the importance of the matter but I know you have a lot to say so it would help me to slow down slightly. You know I haven't really heard that as an argument as to why we might not defer and wait for the Supreme Court. All you're saying is well another person another individual could come in and then they would get an injunction. So instead of having a singular injunction we're at risk of having a cascade of injunctions. Is that your? That's true yes and of course there's also the state's interest in being able to validly enforce its law which is an ongoing constitutional federalist harm to the state of Idaho. So in in these unique circumstances I don't think you need to wait for Scarametti. Now I will pick up on the Scarametti thread because I thought that Judge Sutton's opinion in Scarametti is one that's worth following. I mean that the 11th Circuit's decision in the Agnes Tucker case as well. You also know that the 7th Circuit issued an order. It wasn't a long one that basically agreed with those but each one of those three opinions adopted the same argument that we're pressing here. That when you're talking about regulating the risks and benefits of medical procedures you're not classifying by sex or by by gender identity. We're talking about procedures to help kids with gender dysphoria. We're talking about specific treatments and all three of those circuits concluded that rational basis applies and so you don't even need to get into the science but if you do there's deference. Do you agree that the parents have a fundamental right under the 14th Amendment as to health care decisions for their children? I was going to turn there next because I think that issue was completely resolved by this court's decision in pickup. There are four principles from pickup that I'll quickly tick off. First, parents have no right to choose a specific medical treatment the state has deemed reasonably harmful. Second, plenary review not abusive discretion applies because the district court ruling rests on a premise of law. Same here. Third, pickup cites this court's decision in National Association for Advancement of Psychoanalysis for the principle that there is no no 14th Amendment right to any specific treatment and here we're talking about a derivative right to that. And finally, pickup says you can't compel a state to accept the plaintiff's view of what treatments are safe and effective for minors. That applies full force. I wonder about Idaho's view on this because there was an argument I think it might have been in this courtroom about the right of a minor to cross state lines and get an abortion without notice to the minor's parents. Yes. And in that case, I think that the state of Idaho took the position is that the parent had the right to make that health care decision and one could argue that you have the same competing rights in an abortion to have to not to have as you might have here. So why hasn't Idaho taken inconsistent views on this right? Because that case and this case are the converse of each other, Judge McEwen. There we're talking about a third party, someone not part of the family, taking a child to get a medical intervention without the parent's permission or without them even knowing about it. Certainly every parent has the right to know that something's going to happen to their child for purposes of a medical intervention and be allowed to have some say in that. In this case, it's a parent who is demanding a medical treatment just like the parents did in and the court saying, well, the state gets to make that call. Parents don't get to say, well, the best treatment for my kid would be medical marijuana, even though Idaho doesn't allow that for minors or that the best treatment for my kid would be opioids, even though my state prohibits that after five days use or something like that. And the bottom line, what makes this case different from that one is that we don't constitutionalize medical standards. I mean, what if WPATH and you see in the documents now that they may do this 10 years from now takes the exact opposite position. If you create a constitutional right, parental or equal protection to get these treatments, then Idaho can never adjust and fix its treatments to match what WPATH says in the future. And if that was the standard, it would still be constitutional to have leeches to treat your fever. We don't fix medical practice in the Constitution, and this court should not be the first to do that in Idaho. You started on pickup, and I think we interrupted you with questions. Would you go back to your comments on pickup because I'm very interested in how the application of that is. So just to recap, in pickup you had parents who wanted their child to be able to get so-called conversion therapy. And sometimes we think about conversion therapy as electroshock therapy and other things that happened back in the 20s and 30s that have long been discredited. But all the parents wanted in pickup for their child in California was talk therapy with a counselor. And counselors deal with all kinds of attractions and addiction, whether that be alcohol, drugs, pornography. In this case, it was same-sex attraction. And the parents said they had a fundamental right under the 14th Amendment Substantive Due Process Clause to get that treatment for their their child because they knew better than California what their child needed. And this court said, sorry, no way. When the state decides that that's got the potential to be harmful, then the state's rule controls, not the parents' preference. And that would be just as true, like I said, with medical marijuana. You know, Idaho prohibits lobotomies, which used to be an accepted practice for dealing with some mental health issues. You could go on and on and on. That ultimately the states get to make the call in these areas. One last point that I'll... I have one quick question. Yes, thank you, Judge Hawkins. You've asked us to take Yes. That information existed at the time that Idaho enacted SB 71? I don't believe it existed until after the enactment, but Idaho got the benefit of those documents because of a subpoena in this case. Now, there's a complicated procedural history, so I'm going to pause just by saying at the very top that we don't need those documents. We just didn't want the court to rule and adopt WPATH standards the way the district court did without knowing that they were out there. Here's my question. Yeah. And again, slow down the talk for a minute. Of course, Judge Hawkins. These documents were available and available to the state of Idaho at the time of the preliminary injunction hearing? They were produced... Yes or no? Yes. Did you bring them to the attention of Judge Windmill? Because they had not been reviewed, the answer is no. Oh, you didn't bring them to the attention of Judge Windmill at that time? Correct. It took more than six months to review the hundred thousand pages. The likelihood is this case is going to go back to district court to refine the injunction to meet the requirements of the Supreme Court, correct? Yes, correct. Can you bring that to the attention of Judge Windmill at that time? We tried to bring that to the attention of Judge Windmill before we brought it to this court, and he refused to consider the documents. Well, now you have the Supreme Court saying you need to take a look at and adjust the preliminary injunction to meet at least temporarily these standards. Why not take the opportunity to ask him again? All he can do is say no, and if he says yes, you're back in business. We will certainly ask him again, but this court and the district court don't need the WPATH documents in order to rule in Idaho's favor. That's the point that I want to make clear. You forgive us if we're a little bit concerned that you're talking about documents that have existed for some time, and just now you're telling us about them. So briefly, Judge Dawkins, just to give you the picture, Idaho gets the documents. It's more than a hundred thousand pages. It took Idaho's attorneys more than six months to get through those documents. When they did, they went back to the plaintiffs' attorneys, who had previously said that they would agree to a protective order in this case so that they could be produced to the court, and they went back on that agreement and said they wouldn't. And so then we went to the district court, and he waited several months before we came to this court because the oral argument was getting close. So is it an ideal process? No. Idaho did do the best that it could in the circumstances. Do you need those documents? No, I don't think you do. I understand that because it would be extraordinary on appeal to supplement the record, and I think everyone's acknowledged that. I just don't understand why, on a third-party subpoena, that the state needed to review these documents before they were turned over. Well, certainly for relevancy and to be able to present arguments about why the documents disproved what the expert's position was in this case about WPAS. Why not? I don't know. I spent 25 years in the trial court, and when you sent out a subpoena and the documents came back, everybody got access to the documents, and then you make it's relevant, it's not relevant, it should be under this protective order or that. So I just didn't understand, maybe you can explain to me why these are kind of embargoed for that period of time without the other side seeing them when they're not your documents, meaning the state of Idaho, but they're third-party documents. Right, but what I understood Judge Hawkins to be asking is... Well, this is a separate question. Well, connected, you know, why not turn them over to the court? And I don't believe that trial practice is usually that when you get hundreds of thousands... Not to the court, I'm saying to the other side. Oh, to the other side. I'm not aware why they didn't get those documents. Okay, because to me that's what was extraordinary about these motions that are flying around is, as I said, if you subpoena third-party documents, they're not your documents, they're third-party documents that come to a party in response to a third-party subpoena, and then normally those get turned over and then you can argue about it. But here, and one of the reasons they didn't go to the district court, I guess, is because they were kind of embargoed in the state's review process. Correct. Okay. All right, I will... I realize I'm out of time, but if you grant me a few minutes for rebuttal. Thank you, Judge Fialba. Not a problem. Okay, let's get Mr. Strangio. Okay. All right, Mr. Strangio, as I mentioned, it's my understanding that you are going to allow six minutes of your argument time for counsel from the U.S. Department of Justice. That is correct. Thank you, Your Honor. Good morning. I'll just roll with this microphone. There's a button down there. Yeah. She can help you with it. Oh, yes. Thank you, thank you, thank you. Good morning, Your Honors. Thank you. May it please the Court, Chase Strangio, on behalf of the plaintiffs' appellees. Idaho's HB 71 categorically bans a range of medical treatments that are united solely based on the fact that they allow an adolescent to live in a way that Idaho considers inconsistent with their birth sex. This ban on medical treatment classifies based on both sex and trans status and triggers heightened equal protection scrutiny for at least three independent reasons. First, HB 71 classifies based on sex on its face. By prohibiting treatment if and only if that treatment is inconsistent with a person's birth sex, HB 71 makes a person's sex a but for a cause of the treatment. Second, by classifying based on the incongruence between a person's perception of their sex and their birth sex, HB 71 facially classifies based on transgender status. Having a perception of one's sex that differs from one's birth sex is the very definition of being transgender and, under this Court's precedence, a proxy classification for transgender status triggering heightened equal protection scrutiny. And third, in addition to the law's facial sex and trans status classifications, HB 71 was passed in part because of its adverse effects on the ability of transgender adolescents to live in accordance with their birth sex. By design and effect, it enforces Idaho's preference for gender conformity. For all these reasons, this law must be tested under heightened scrutiny, and none of the appellant's arguments for applying rational basis can be squared with this Court's precedence and the Supreme Court's precedence. So let me ask you this, counsel. I noticed that pickup versus Brown wasn't addressed in major detail in the briefings on your end or your side. How does the argument that there is a fundamental right for parents to obtain these treatments for their children survive in light of the pickup holding? So, Your Honor, I think that the way in which to understand this case and pickup together is possibly an articulation of the burden that was not done in the way I would have done it in pickup. So here you have a law that categorically bans medical treatment for minors and parents, but that treatment is available for adults. And so the the fundamental right is the Supreme Court has articulated it in Parham, is the right to direct the medical care of one's minor child. The burden on that right here, and I would say analogously in pickup, with all candor, but it was not articulated this way in the due process discussion in pickup, is very, very minimal. That the burden is the, in essence, what has happened is the government, in all other contexts, trusts and expects parents to weigh the risks and benefits of treatment that are available for adults. In the parental context, it's the parent who consents to the treatment for the minor. And so it is the ban on the treatment that is available to adults, but banned only for minors, that burdens that right. And then I think Idaho says, well, it may burden the right, but there's not an absolute right, particularly if the state has made either a legislative or other finding that there's harm in the treatment. Your Honor, I think that that goes to the application of scrutiny. So the question, when the right is burdened, you get to the application of, I would say, a heightened scrutiny. If you look at, for example, Troxel, which deals with the parental right, the court sort of identifies this as a heightened scrutiny. And I think somewhere between heightened scrutiny and strict scrutiny applies, and that's where you get to the question of whether or not the burden is justified. And coming back to, if I could, to the equal protection claim, because I think my friend on the other side was confusing in his discussion the question of whether a classification exists, that suspect or quasi-suspect, that triggers heightened scrutiny with its application. Because we heard a lot about, well, these are different treatments with different risks and different benefits. And that is a question for the application of heightened scrutiny. That does not change the existence of the classification on the face of the statute in this case. Where does, well, he mentions two cases that I'm sure both he and you are prepared to deal with. And one is Bostock, says, well, that really doesn't apply in this context. And then second, Gonzales, where we need to defer to the legislature. So I think Bostock does apply. I also think you could recognize these as trans status and sex classifications without Bostock. These are, it's right in the face of the statute as I was discussing. But in terms of the applicability of Bostock and Bostock's conclusion that to classify or discriminate based on trans status is to do so based on sex, that Bostock was reasoning that based on sort of two principles. Sex being a but-for cause, which we have discussed a little bit, is the same here. And that the law, the disparate treatment based on sex, which is also present here. Now, this court has already recognized that Bostock is not limited to Title VII. So this is already a different case than Scrimeti, than Eknas-Tucker, Doe v. Snyder. This court has sent the case back down because the district court's reading of Bostock was too narrow, applied the reasoning from Bostock to the Equal Protection Clause in Hecox. So I think in the Ninth Circuit, Bostock has already been applied outside the context of Title VII. Then with respect to Gonzales v. Carhart, which is a due process case, and my friend on the other side referenced the medical and scientific uncertainty language from Gonzales v. Carhart, it does not stand for the proposition that when a government action classifies based on trans status or sex and has to apply heightened scrutiny, that somehow fact finding by the district court is not deferred to. And in fact, Gonzales v. Carhart says that where individual constitutional rights are at stake, the court has an independent duty to review those. So I think that the other side is mixing up a number of different doctrines, and I sort of want to continue to tease them out. Because first is the question of what is the classification in this statute? And it's a sex classification and a trans status classification. And that means that that heightened scrutiny applies. Would your position be the same if HB 71, this hypothetical obviously, were aimed at children five and under? If the if the law prohibited medical treatment for the same purpose to affirm a gender different than one's birth sex, the classification would still be a sex and trans status classification. I think then the question is, would that prohibition survive the requisite heightened scrutiny, which would be a fundamentally different question, in part because the record shows, and it's not disputed, that there are no medical treatments provided to individuals for purposes of treating gender dysphoria prior to puberty. So the classification is the classification. Then the question is, when it's then applied, and this is an important distinction from Gonzales v. Carhart, which the test under equal protection heightened scrutiny is, does the sex, or in this case, sex and trans status classifications, substantially advance an independent, important governmental interest? And the government's burden is to show that the line they've drawn advances an important interest. And here they have failed to do that. But going back to Judge Hawkins' question, it's important, this is why it's so important to separate out the classification question, what level of scrutiny applies with its application, and then then you look at at the record. I want to get to the application of heightened scrutiny, but I do quickly want to address the Dobbs-Gedoldig argument that has has come up. Under Dobbs and Gedoldig, this law triggers heightened equal protection scrutiny for the three reasons that I identified. It's a facial sex classification, it's a facial trans status classification, and it was passed in part because of its adverse effects on transgender adolescents. Dobbs and Gedoldig, in essence, stand for the proposition that you can't deny benefits to someone because they're a man or because they're a woman, but concluded that denying benefits based on pregnancy and Gedoldig, classifying based on on abortion is not the same as denying benefits because of sex. So that that's what the decision stood for, that it wasn't a facial sex classification. Here, HB 71 does exactly, when we're talking about the sex classification, what Dobbs and Gedoldig say does trigger heightened scrutiny. In each application, it denies benefits because someone either has a birth sex of male or a birth sex of female. So Pam Poe could access medical treatment to affirm a female gender identity, but for her assigned sex of male. That is how... How does that differ from Gedoldig, where only women, or in this case, if you would say just a trans person, can't have, you know, you can have the pregnancy differential? So I think it's a different analysis with respect to the sex classification versus the trans status classification, excuse me. So focusing on the sex classification first, which I think is importantly distinct from the status one. In... This is not a, as you, your honor, alluded to earlier, a medical treatment or a series, in this case of medical treatments, that is limited to one sex. In order to determine whether or not treatment is prohibited, Idaho bases that determination on an individual's birth sex and whether the treatment is inconsistent with it. So if Pam Poe goes to the doctor with, let's say, a person designated female at birth, but they both have a female gender identity, and they both have distress, let's say, because they have masculinizing impacts of some aspect of their puberty, it's the treatment to feminize their appearance is only prohibited for Pam Poe, not the person with a sex designated of female at birth, because Pam Poe's sex designated at birth is male, and Idaho considers the inconsistent with that sex. So it is but for her sex that the treatment is prohibited. Let me ask you about what's now in front of the court, because we have a dramatically narrowed injunction that applies only to the plaintiff here, correct? Correct. And that individual plaintiff, as I understand it, isn't seeking surgery. That's correct. At this date. So does that affect how we look at the district court's factual determinations and what's in front of us, or are we looking at Poe and nobody else, or are we looking broader? So, Your Honor, with with respect to the classification in the statute, you know, that's a legal question and it remains. And then the question of the individual Pam Poe at the center of this case, I still think the factual findings with respect to the medical care, and this is important because the district court found that the risks of this treatment are comparable to the risks of many other forms of medical treatment that parents routinely consent to on behalf of their minor children. That's relevant to the tailoring of this law, and that's the question, can the government show a close means and fit between this categorical prohibition on a range of treatments and an interest in protecting children? I hear what you're saying, it doesn't quite get to my question, though. My question relates to Poe, who isn't seeking surgery, but is seeking other medical care. Is that the injunction that we're reviewing on appeal, or are we reviewing an injunction that goes to all range of medical treatment to treat gender dysphoria? So, you're reviewing the injunction that applies to her. So, it's an injunction with respect to the medical treatment that she's present. So, that is the injunction. I think the factual findings still remain relevant because the legal analysis under equal protection is whether or not the line that the government has drawn substantially advances an important governmental interest, and it's important to recognize the lack of the close means and fit between what they say they're doing, protecting children, and what they've done, which is categorically and criminally prohibited a range of treatments because those treatments allow individuals to live in a way that is inconsistent with their birth sex. But turning... I'll ask you the same question that I asked in Idaho, and that is, should we wait for Skirmeti? So, Your Honors, I think that this may be the one area where we agree, and, you know, I think that there is value in answering the question about the constitutional rights, the critically important constitutional rights that are at stake here for PAMPO, for the rest of this circuit, because these are laws that cause significant, significant harm to adolescents. I understand that, but I'm reading the certified question, or the cert-granted question to the Supreme Court, which looks like a pretty comparable statute out of Tennessee. So you're saying we should decide it now because there's some kind of psychic or other harm that's floating out there by virtue of the law? Oh, so no, Your Honor, I didn't mean that necessarily. I mean, I think that there's the concrete injury to POE, and then there's the constitutional injury to POE, and there's the clarification of the law. I will also say that the Supreme Court did not grant the due process question, so that's independent. And I would, coming back to something, and I see that I am over time, and if I could just have one or two more minutes before I turn it over to the United States. In addition to the lack of the due process question, there is the fact that I think that one of the reasons this is a law that triggers heightened scrutiny is that it was passed, as I mentioned, because of, and not just in spite of, its adverse effects on transgender adolescents' ability to live in accordance with their gender identity. And that is a statute-specific inquiry about this statute and its intended effects. And so I think that each statute should be considered on its own terms and that it triggers heightened scrutiny for that reason, and that the government has not met its burden based on the record that was before the district court. I know we talked a little bit about the extra documents. I will, unless I'm wrong, request on our briefing in that regard. But I do just want to quickly come back to Pam Poe. There is a young woman at the core of this case, and she, like many other individuals, experienced tremendous life-saving benefit from this treatment. And the district court made factual findings to that point about the benefits of this care. Going back to... And maybe I'll come back to my question. If we limit it only to Poe and Poe's requested treatment, is that the appropriate construct on appeal now, given, having gone up to the Supreme Court and back, and that we just have Poe in the case? Yes, Your Honor. We accept that that is the current injunction. It is limited, and to her parents. Right. Yes. They are the only family to whom the injunction currently applies, and that is the question on appeal. I still would contend, as we've been discussing, that the rest of the factual findings are relevant to the analysis of the lack of close means and fit between a felony categorical ban on treatment with no exceptions and a purported interest in protecting children. With the injunction in effect, is there evidence in the record as to whether treatment has proceeded? Treatment has proceeded for Poe? Yes. Well, it is not in the district court record, because the decision was prior to January 1st, which was the effective date of the law. But the injunction is in place, and she has the protections of the injunction. All right. Thank you. Ms. Hecker? Good morning, Your Honors, and may it please the Court, Elizabeth Hecker for the United States. I'd like to just start out, if it's okay with the Court, just presenting the United States position, and also then move on to address some of the specific questions that the Court has asked. Under this Court's binding precedent, HB 71 warrants heightened scrutiny under the Equal Protection Clause. No court, no court, has held that laws like these survive this demanding review, and this Court should not be the first. HB 71 warrants heightened scrutiny on two grounds. First, as this Court squarely held in Karnofsky and Hecox, laws that discriminate against transgender individuals are entitled to heightened scrutiny because transgender people themselves represent a quasi-suspect class. It cannot be seriously disputed that Idaho passed this statute specifically to deprive transgender minors of a treatment that it allows for other purposes. The statute also warrants heightened scrutiny because it relies on sex-based classifications, and it does so in three ways. First, it conditions the legality of certain medical treatments on a minor sex assigned at birth. To know if a you have to know the minor sex assigned at birth. This is a facial sex classification. Second, as the Supreme Court held in Bostock, laws that differentiate based on transgender status are necessarily a form of discrimination based on sex because they discriminate against individuals identified as one sex at birth and another today, and this Court recognized the same in Hecox. And finally, this law disadvantages minors based on their gender nonconformity, which this Court has recognized, again in Hecox, is a form of sex discrimination. It says to minors, you can have this medically necessary treatment as long as you're not using it to look like a sex other than the one you are assigned at birth. Hecox discusses this as well. The state has failed entirely to show, as is its burden, that it has a legitimate interest in banning these treatments. As the District Court specifically found, the treatments at issue here, when provided in accordance with the WPATH and Endocrine Society guidelines, are safe, effective, and medically necessary for some adolescents. These findings were grounded in the testimony and are reviewed for clear error. I'd like to point out, Your Honors, with respect to the discussion that Mr. Bursch spoke with the Court about, with respect to the clear error deference in legislative findings, in Lotta v. Otter, in this Court's decision in 2014 regarding the ban on same-sex marriage that I believe was Nevada and Idaho had passed, this Court said, unsupported legislative conclusions as to whether particular policies will have effects of the sort of issue in this case. Determinations, which often, as here, implicate constitutional rights, have not been accorded deference by the Supreme Court. Counsel, the arguments I hear you making seem to be addressed as if the Supreme Court's intervention, if you will, didn't exist. So I have the same question I think both of my colleagues do, and that is, what injunction are we looking at? There is no question we will have to send this case back to the District Court to comply the injunction with the requirements of the US Supreme Court. So is that what we're looking at or the broader issue? So, Your Honor, I think that certainly you're looking at, so there's a bit of a difference between kind of the merits of the case and the findings and the findings of law and the injunction itself. This Court's determination that this law is entitled to heightened scrutiny will still matter regardless of the scope of the injunction. This Court's findings with respect to the effectiveness of this care still matter regardless of the scope, and this Court's findings with respect to the WPATH and Endocrine Society guidelines still matter regardless of the scope of the injunction. And I want to just specifically zero in here on heightened scrutiny. The courts in Scarametti and Agnese Tucker, the case that is going up to the Supreme Court, both upheld these laws only on rational basis standard. I believe this Court's holdings in Hecox and Karnosky foreclose that finding. It forecloses a rational basis test on this case, and I think that this is the reason not only is heightened of the injunction, but this Court's opinion in this case, when it comes down, will be able to inform the Supreme Court when deciding Scarametti, which it ultimately will do. The Court will have... I know that they've always asked for our opinion on how they should resolve their cases, but, you know, of course we're always honored if they do. Yes, Your Honor, I think that it will be very important because I think that this case and this particular law and laws like this are so clearly entitled to heightened scrutiny review, and I believe that that was a major, major flaw of the Scarametti and Agnese Tucker opinions. As Mr. Strangio alluded to, both of those opinions repeatedly conflated the two steps of the equal protection analysis. They essentially said that these laws are not entitled to heightened scrutiny because they serve different purposes. But that's not what determines whether a law is entitled to heightened scrutiny. What determines whether a law is entitled to heightened scrutiny is, is it a sex classification or does it discriminate based on some other protected class? That is step one. If those standards are met, then it is entitled to heightened scrutiny, and the purpose of the law goes to the second step. Both the Scarametti opinion of the Sixth Circuit and the Eleventh Circuit's opinion in Agnese Tucker conflate these two steps. That is absolutely something that Supreme Court could use some help with, Your Honors, and I believe that this court could really provide that help, and the Supreme Court should be considering this on a heightened scrutiny standard. I see my time is up. If the Court has any more questions, I'm happy to answer them. Thank you, Counsel. Thank you. All right, Mr. Birch, I will give you an additional three minutes for rebuttal. Thank you, Judge DeAlba. It pleased the Court. I quickly conferred with my co-counsel about the WPATH documents. The reason they were not immediately provided to the other side is because they were under a protective order, and we needed to have a protective order in this case in order to produce them, and the parties weren't able to agree on that. Next point, which is the crux of this argument, this statute does not classify based on sex or transgender status because it's not about who seeks treatment, but about the benefits and risks of the treatments requested, and when I listen to their equal protection arguments, it's difficult for me to follow, and the United States' argument right there at the end really tied it up in a bow. She said, is it a sex classification? If yes, then heightened scrutiny applies. Well, that's the exact argument that the Supreme Court in Dobbs rejected. There's no question that the Mississippi 15 weeks law classified based on sex, and the Court supplied rational basis review. Another way to look at this for plaintiff's counsel, say that Idaho had a that said they would only reimburse natal men who identify as men for prostate cancer treatment, and the same law was in place for women. They would say that that violates equal protection, and heightened scrutiny applies because a woman who identifies as a man or a woman who identifies as a woman would not be eligible for prostate cancer treatment coverage, but that's not how equal protection works. Equal protection asks whether there's a benefit or a burden that was imposed on one side or the other in a way that the other side can't get at it, and no woman, no matter how she identifies, can get treated for prostate cancer. Biology matters, and that's what the U.S. Supreme Court said in Dobbs and in Godeldy. So do you speak to sex? What about transgender status? Well, the exact same thing would apply. Even if it was a 100% overlap, and it's not, I can explain that, you would still have to ask whether there was a benefit that was being denied simply because of the status as opposed to the medical consequences. But I want to even push back on the premise. Let's say that you have someone who gets the transition treatments and then realizes they were a mistake and that it's harmful, and so they detransition. They're called a detransitioner. Well, for them, the plaintiffs would say that person was never trans, and so that means that even non-trans people can be churned down for these treatments, and therefore there's not a one-to-one relationship. And if they're wrong and that person was trans but now they're not, that proves that these treatments aren't always necessary, which is what the abundance of science says. Now, related to that, the United States makes this non-conformity point, but it's not a stereotype that the same treatment has different risks and benefits for males and females depending on the diagnosis. Again, for you to rule in their favor, you have to say risks and benefits are the same when a girl gets a mastectomy for cancer versus gender transition. Finally, even if heightened scrutiny applies and you defer to the district court, which you shouldn't under Gonzales, at pages 11 and 12 of the district court opinion, he says that these procedures benefit only some of those who have gender dysphoria. That means many, maybe even most, don't benefit, and that's reason enough for Idaho to prohibit the treatments. I do want to address the scope of relief because Judge McKeon and Judge Hawkins both mentioned that kind of towards the end there. So as far as your injunction is concerned, it is, of course, limited to the plaintiff by what the Supreme Court said, but there are only facial claims in this case. So you're not analyzing this in an as-applied manner to the plaintiff, but only facial. We respectfully ask that you do not require Idaho to use children as medical experiments. Thank you. Okay, thank you, counsel. The matter is now submitted, and this concludes our arguments for this morning. We'd like to again thank all counsel and our court staff. The court will now stand in
judges: HAWKINS, McKEOWN, ALBA